IN THE UNITED STATES BANKRUPTCY COURT
SOUTHEN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 10-33397 |
| | : | |
| Jeffery A. Faulkner | : | Chapter 11 |
| | : | |
| | : | Judge Humphrey |
| Debtor and Debtor in Possession | : | |

---

**FIRST AMENDED DISCLOSURE STATEMENT OF DEBTOR AS MODIFIED PURSUANT TO DISCLOSURE STATEMENT HEARING AND FURTHER ORDER OF THE COURT ENTERED SEPTEMBER 8, 2011.**

---

**I.**

**A.  Introduction**

Jeffery A. Faulkner, Debtor and Debtor in Possession ("Debtor") provides this Disclosure Statement to all of his creditors to provide adequate information pursuant to 11 U.S.C. § 1325 for the First Amended Plan of Reorganization filed by the Debtor on June 10, 2011,amended on August 26, 2011 and amended pursuant to a Court order entered September 8, 2011.

Those creditors whose claims are _impaired_ under the Plan may vote on the Plan by filling out and mailing to Thomas R. Noland, Statman, Harris & Eyrich, LLC, 900 Fifth Third Center, 1 South Main Street, Dayton, OH 45402, and a Ballot which will be supplied by Debtor. In order for the Plan to be accepted by Ballot, Ballots of voting creditors who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims of all Classes must be cast in favor of the acceptance of the Plan.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO HIS FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE VALUE OF ANY PROMISSORY NOTE TO BE ISSUED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDTIONAL REPRESENTATIONS AND/OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE DEPENDENT UPON

INTERNAL ACCOUNTING PERFORMED BY THE DEBTOR. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

## B.  History

Debtor began acquiring real estate properties in the mid 1980's but took title to the properties in the Jeff A. Faulkner Family Trust ("Trust"). Debtor created the Trust in 1995 and was the sole grantor of the revocable Trust with the Debtor holding the sole power to revoke the trust. Debtor continued to acquire in the Trust properties through 2009. Debtor acquired single family rental properties initially and then some multi-unit residential properties financing through lenders in many instances that had taken back distressed properties and financed them for the Debtor. Some of the single residential rentals were built in the late 1800's and early 1900's and require higher maintenance and repairs. Debtor is the sole member of Faulkner Investment Real Estate Company, LLC, ("Firco"), which manages the real estate properties, with the exception of Debtor's residence. Debtor has no employees and contracts out maintenance and repair work to independent contractors.

Debtor also became familiar with Section 8 housing requirements and began to participate in the local Section 8 program administered by the City of Middletown, Ohio. Debtor was presented an opportunity to acquire 16 units and 64 units of a complex now known as "Northgate Condominiums" in 2006. The 80 units, while carried as condominiums on the land records of Butler County, Ohio, had never been operated or sold as condominiums and always were used or rented as apartments. Debtor acquired 16 units from the Lloyd Family Trust in 2006. Debtor negotiated with Kelly and Brenda Hollon the owners of the other 64 units  and acquired land contract interests in the 64 units on June 30, 2006. Prior to the closing Debtor was told no closing on the land contracts would occur if he did not sign a separate note payable to the Hollons. The closing on the land contract was conducted at the offices of Middletown Title Agency and the Debtor paid $250,000 at closing with the balance to paid in the land contracts and the land contract interests were recorded.

The Hollons, after the land contract closing was completed, took the Debtor to another office and had the Debtor sign a separate note for $375,623.51. By that time Debtor had been repairing the units and had invested money into the units which he would lose if the land contract deal did not close.

Despite the obligations of the Hollons to pay real estate taxes on the units as provided for in the land contracts, they failed to pay nearly $25,000.00 in real estate taxes required by the land contracts, despite having been paid such funds from the land contract closings in order to pay such real estate taxes for August 2006 and February 2007.

Debtor, on being later being approached by the Hollons regarding the Note, raised the failure of the Hollons to pay the February 2007 real taxes as required by the land contracts . After negotiations to settle the Note, Kelly Hollon requested Debtor transfer his 29 foot boat to

settle the promissory note in return for the Hollons to honor the payment of real estate taxes as required by the Land Contracts. Debtor signed over the boat title and in return he received a paid in full receipt from the Hollons as to the promissory note, and the boat title was transferred by the Hollons. The Hollons made the first payment of taxes as required by the Land Contracts, but failed to make the second payment as required by the Land Contracts.

XXX

As a result of the 80 units being listed in the land records as condominiums, the appraisal was substantially higher than had the units been registered as apartments. The units are all 750 sq. foot units. The tax assessment on each unit was approximately $33,000.00 per unit; however, no units ever were held for sale and several recent appraisals by the Debtor, by JP Morgan Chase Bank and by First Financial Bank place the units as having a value in the range of $12,500 to $19,500 per unit. These inflated real estate taxes taxed the realizable cash flow of the 80 units. This combined with the recession beginning in 2007 and continuing caused the loss of income as obtainable rents fell and vacancies increased.

The land contracts were paid through later financing the Debtor obtained from J.P. Morgan Chase Bank in the amount of $2,012,748.00 and  through a First Financial Bank loan  in the amount of $456,000.00. The Chase financing paid the real estate taxes the Hollons failed to pay in accordance with the Land Contracts. Interests rate were in the 7 to 8 percent range or higher before the recession hit.  The combination of the higher interest rates, inflated real estate taxes and the declining income cause Debtor to suffer losses on the rental properties.

As Debtor brought more of the units into the Section 8 program, he faced more opposition by the City of Middletown in trying to advertise the houses and units. The City candidly admits it was trying to reduce Section 8 housing in the Middletown area and try to disperse it more into Butler County.

Debtor also suffered damage when the City of Middletown was required to close drainage of sewer water into a nearby river, causing the sewer water to be diverted and drain onto the back adjoining land of his rental units creating an attractive nuisance and health issues which Debtor was forced to clean up in order to be able to keep the units rented. Debtor also has claims for illegally boarding up on one of his properties by the City of Middletown and  may also proceed with claims for harassment by a city employee related to that matter and others involving selective enforcement of alleged code violations.

The Hollons' understanding of the facts concerning the transactions with the Debtor differ from the Debtor's description of those transactions. Their version of the events is as follows:

a. It was Faulkner, not the Hollons, who said he could not close the purchase
from them for the agreed price if he were not allowed to execute a note, outside of the
closing, for the balance due that he owed the Hollons under the parties' agreement.
b. In order to induce the Hollons to close the transactions and execute land
contracts and deeds, Faulkner drafted the Note. It was also Faulkner, not the Hollons, who

went to an office next door, where he signed before a Notary a separate promissory note for the balance owed.

c. Faulkner offered to "sell" his boat to the Hollons, in exchange for a credit against the Note, which has now been given.

d. It was not the Hollons who gave a receipt to Faulkner, but Faulkner who gave a receipt to the Hollons, for the purchase of Faulkner's boat, showing only that the Hollons' purchase price owed to Faulkner for the boat was paid in full, by applying the balance due ($30,000.00) on the boat, against the Note. There is no credible evidence the Note was discharged by the boat sale.

e. The parties negotiated and reached an agreement for payment of the preclosing taxes for the Hollon sale, which were disputed when initially due. Under this agreement, the Hollons were to provide a credit for the pre-closing taxes against the amount owed by Faulkner under the Note, which credit has also now been given.

f. The Debtor had not "settled and paid for" the promissory note (which was face amount in excess of $375,000.00), merely by a $30,000.00 boat and less than $20,000.00 in unpaid taxes. Faulkner in fact made several interest payments as the Note required (although not in the correct amounts), after the boat and tax transactions. It was only when he discontinued making those payments that the Hollons brought a State Court suit. Faulkner actively defended this case with the assistance of more than one attorney, and the parties engaged in several months of active mutual discovery. Faulkner filed this Bankruptcy, not when the state suit was filed, but when he was facing a default judgment as a discovery sanction for not attending his own noticed deposition.

## C.  Events Leading to Chapter 11

The above events were pushing Debtor toward insolvency, but the precipitating factor was a lawsuit brought in the State Court by the Hollons suing on the Note which Debtor had settled and paid for. Debtor did not have sufficient additional income to support a state court legal battle, while not being able to sustain the debt service payments to his lenders. The above factors lead to the Debtor's decision to file the Chapter 11, to seek modification of the notes secured by mortgages to reduce the amount of the secured debt and interest rates associated with the Notes to fit currently obtainable cash flows from rents and operating expenses, while seeking to reduce real estate tax assessments and enter into delinquent real estate contracts to repay delinquent real estate taxes over a 5 year period.

## D.  Post Bankruptcy Operations

Debtor filed for Chapter 11 relief on May 25, 2010. Debtor immediately began negotiations with various lenders to obtain consensual cash collateral agreements and meeting with lenders to begin the process of negotiating modifications of the loans in place on the various properties. Debtor filed its schedules and statement of affairs on June 9, 2010 and began preparing for filing approximately forty property questionnaires requested by the U.S. Trustee, covering approximately 114 properties ("Properties").

No Creditors' Committee was appointed as the U.S. Trustee reported it was unable to form a committee due to lack of people or entities willing to serve on such a committee.

Debtor began rehabilitation on certain of the Properties that had been damaged or had experienced deferred maintenance. Debtor began to file agreed cash collateral orders with lenders beginning July 8, 2010 and began review of the Properties and engaged an appraiser to determine present values of the Properties in part to present to the Board of Revision pertaining to real estate tax assessments. Consent Cash Collateral Agreements were reached with Farmers and Merchants Bank, National Bank and Trust Co., American Savings Bank, Mid-First Credit Union, PNC Bank, First Financial Bank and JP Morgan Chase Bank, Debtor was in contact with counsel representing Bank of America and HSBC on properties where cash collateral orders were not entered as counsel indicated the lenders were not prepared to discuss terms at that time; however later agreements were reached as set forth in Exhibit B and F attached hereto.

Debtor experienced a severe interruption in its cash flow post-petition when the City of Middletown unilaterally terminated the Section 8 units of Debtor from the program based on the fact Debtor had unpaid real estate taxes. Two months of rents were lost and tenants lost as well as such tenants needed to reside in Section 8 property. This termination was ultimately reversed after discussions were held with the City Attorney for Middletown and because Debtor had already negotiated a delinquent real estate tax repayment Plan with the Butler County Treasurer.

Debtor was able to recover from this interruption in cash flow over another four months and has brought most units into good rentable shape during the Chapter 11 proceedings and has increased the occupancy rate during the Chapter 11.

Debtor has filed modification or reaffirmation agreements beginning in December 2010 with American Savings Bank, Farmers and Merchants Bank, and thereafter with National Bank and Trust Co., Mid-First Credit Union, JP Morgan Chase Bank, PNC Bank, N.A., First Financial Bank, Federal National Mortgage Association, BAC and HSBC. Only one lender has failed to reach a modification agreement at this time as to one property out of the 144 units. Debtor and lender have agreed to the recued amount of the secured claim to be $20,000 and interest rate terms are still being negotiated. Debtor has been paying monthly principal and interest on the modified notes once the reaffirmation-modification documents were filed with the Court. Debtor has been able to service the debt on the Properties in which modifications have been filed or agreed upon during the course of this reorganization.

Only one property has not been resolved by modifications at this point, see Section F below.

Further information on the economic performance of the Debtor post-petition can be found in summary of the monthly operating reports filed with the Court attached as Exhibit "A".

### E.  Tax Implications of Reorganization

The Debtor continues to file a 1040 tax return with Schedules C and E . If any properties are surrendered this should not result in any "forgiveness of indebtedness income" as Debtor was

insolvent as of the Petition Date as he is responsible for all debt of the Trust Properties. The Trust is a disregarded entity for tax purposes. To the best of Debtor's current knowledge, Debtor or Debtor's counsel, by this statement, are not and should not be construed to be rendering tax advice to any creditor or party in interest or recipient of this Disclosure Statement. You should consult a tax professional for advice on the treatment provided in this Plan.

### F.  Post-Petition Litigation or Contested Claims

The Debtor has been engaged in various contested matters and one adversary action post-petition. Debtor has filed numerous contested matters to determine if the claims of certain lenders should be allowed and if allowed, to determine the amount of such lender's secured and unsecured claims. Debtor anticipates all contested matters will be resolved by agreed order but for the adversary action brought by Kelly and Brenda Hollon, Adversary Case No. 10-03353, claiming that Debtor did not pay a note payable to them and the non-payment was fraudulent. The Hollons are seeking the denial of discharge of their claim. This is the Note referred to earlier in Article I, Section B. Debtor claims the Hollons defaulted on their agreement to pay real estate taxes and such Note was resolved by settlement and release.

There remains one unresolved contested matter regarding 2108 Winona [Docket 201/228]. To the extent modification or agreement is not reached prior to confirmation, the Court may hear those contested matters at or before the confirmation hearing.

Debtor intends to file adversary proceedings against the City of Middletown for the claims set forth in Section B. above if a resolution is not made before confirmation.

### G. Post-Confirmation Operations and Management

Upon confirmation of the Plan, Debtor, through the Trust, shall retain ownership of all Properties and all property of the estate shall vest in the Trust or the reorganized Debtor, except those properties, if any, where Debtor has turned over possession of a property to a lender prior to or at confirmation, or any property that may be turned over that is currently involved in a contested proceeding.  Debtor will continue to be the sole member and officer of Firco, which shall continue to manage the properties retained. Firco has no employees since filing for relief but has recently added a part time assistant to help in the management of the real estate businesses. Debtor also contracts with two individuals for tenant services and maintenance and those expenses are contained in the Projections, Exhibit "E".

No family, relatives or insiders will be involved in the management of the retained properties. Debtor will not draw funds in excess of $4,200 per month for his personal living expenses in any month where revenues are not collected to meet the debt-service provided for in the confirmed Plan, taxes and other necessary operating expenses. The $4,200 is accounted for in the management fee for Firco set forth in the projections and also is reflected in secured claims payments, which include payment for the residence mortgages, insurance and taxes and the Tundra pickup truck. Debtor expects to generate additional income from a car wash operation or from leasing a carry out location. Such anticipated income is projected and set forth in Exhibit "E" projections, any  such income to be committed to payment of debt provided for payment in

Case 3:10-bk-33397   Doc 383   Filed 09/09/11   Entered 09/09/11 14:00:49   Desc Main
Document     Page 7 of 25

the confirmed Plan of reorganization and may permit the Debtor to accelerate the making of payments provided for Class 7 unsecured claims.

## II.

### A.  Classification and Treatment of Claims Overview

Debtor has several mortgage lenders, namely Farmers and Merchants Bank, National Bank and Trust Co., American Savings Bank, Mid-First Credit Union, PNC Bank, JP Morgan Chase Bank, First Financial Bank, Federal National Mortgage Association, HSBC Bank USA. Trustee and Bank of America.

All of these lenders hold similar claims, holding mortgages securing real estate properties held in the Family Trust that are rented or are listed for rent by the Debtor through Firco.

Several lenders, namely Farmers and Merchants Bank, National Bank and Trust Co., American Savings Bank, Mid-First Credit Union, JP Morgan Chase Bank, First Financial Bank, PNC Bank, Federal National Mortgage Association, Bank of America and HSBC and Federal National Mortgage Association have reached agreements for loan modifications with Debtor, have already entered into loan modifications reflected by reaffirmation agreements or as authorized in a Final Order so governing Treatment of their Claims. Those properties in which modifications and/or reaffirmations have been reached are set forth in Exhibit "B" and "F".

One of the remaining 114 properties has not been resolved and the remaining lender continues to negotiate with the Debtor to reach a modification agreement. The property in which agreement has not been reached is set forth in Exhibit "C".

Unsecured claims will be treated in one class, which will include all claims not otherwise classified. This will include under-secured claims of secured lenders which will be treated as Class 7 claims to the extent they are not treated as allowed secured claims.

### B. Claims Classification and Treatment

The Plan of Reorganization, or any amendment thereof, is on file with the Clerk of the Bankruptcy Court for further review and a copy of the most current version will be sent with this Disclosure Statement once approved by the Court.

**THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN.**

### Class 1:  Administrative Claims.

Administrative Expenses: Certain entities including Debtor's attorneys, accountants, appraisers, or other professionals authorized to be employed by the Debtor, if any, may file

Applications with the Bankruptcy Court for the allowance of compensation and reimbursement of expenses. Requests for compensation are subject to approval by the Bankruptcy Court after a hearing on notice at which the Debtor and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses. Attorney fees are not known at present, but are estimated to be $128,000.00. Due to expected recover of insurance claims proceeds to reimburse Debtor for claims made for repairs or damages, the Debtor believes those professional fees will be paid from such recovered claims before or at Confirmation. Other professional fees are not know at present, but are estimated to be $5,000.00 at Confirmation. These amounts may be greater or lesser depending upon matters involved in the Chapter 11 proceeding, including issues relating to claims and the confirmation of the Plan. The allowed professional fees, after court approval shall be paid the later of 60 days after Effective Date or within 60 days of approval, unless otherwise agreed upon by the parties.

Additional administrative expenses would include U.S. Trustee fees unsatisfied at the time of the Plan Confirmation, which at this time are estimated to be less than $2,000.00. U.S. Trustee fees continue to accrue until the case is closed by a final decree. Other allowed administrative claims will be paid within 30 days of allowance. Any party seeking payment of an administrative claim must file such a request on or before the confirmation hearing date, except claims that accrue post-confirmation. The claims of Class 1 are impaired.

**Class 2:  Real Estate Claims – Secured Claims – Modifications Reached.**

The lenders having collateral security for the Notes owed by the Trust and/or the Debtor will be allowed a secured claim in the amount of the value of the collateral as set forth in the filed reaffirmation-modification agreements or any Final Order governing the same but no more than the allowed secured claim of the lender. The lenders having reached agreement as to value of the collateral mortgaged or having entered into modification agreements establishing the secured amount of their allowed claim will receive the treatment as provided for in the respective modification-reaffirmation documents as to the secured claim. See Exhibit "F" for the docket number and summary of terms for reaffirmation-modification agreements reached with Lenders. Lenders, the Trust and Debtor shall be bound by the terms of the respective reaffirmation-modification agreements and Debtor shall receive no discharge of the obligation as provided for in the respective reaffirmation-modification agreements or any Final Order governing the same until such allowed secured claim provided for is fully paid.

Any amount of the allowed claim of a lender that is not an allowed secured claim shall be treated as an unsecured claim as set forth in Class 7. Debtor shall remain liable in the same manner as he was liable as to the original note for the amount of the allowed secured claim, unless otherwise provided for in the reaffirmation-modification agreement or any Final Order previously entered in this case. Should the allowed secured claim be less than the amount due on the Note at filing, the amount not allowed as a secured claim shall be treated as an unsecured claim and treated in accordance with Class 7.

Lenders included in this Class 2 treatment are impaired. See Exhibit "B" listing such lenders and properties. Should any lender not file a proof of claim, not contest any amendment disputing their claim, nor contest an objection made to their claim; such claim shall be treated

only as a Class 7 claim, if allowed, and such lender shall be bound by the 524 injunction issued at confirmation of the Plan, including without limitation, taking any action to collect upon its claim while the Debtor is performing the terms of the confirmed Plan and the case has not converted to Chapter 7 proceedings.

Proof of claims having been filed as secured claims related to real estate and motor vehicles total $6,287,546.30. The reaffirmation-modification agreement with American Savings Bank regarding the $20,000 note secured by vehicles shall be extended on the maturity date to 12-31-2011 and a principal payment of $1,000 to be made July 1, 2011 with interest monthly thereafter until maturity. The financing agreements on the Toyota Tundra with Toyota Financial and the Honda Odyssey with Chase Manhattan will continue to be paid pursuant to contract terms.

**Class 3:  Real Estate Claims Properties retained by Debtor with no modification of Note in place or no agreement reached as to modification at confirmation, Treatment of Surrendered Properties.**

The remaining Lender included in this Class is JP Morgan Chase as to 2108 Winona. The parties are still negotiating to try to reach modification on Note. No agreement has been reached at this time other than it is agreed the value of the property is $20,000.00 and that will be the amount of the allowed secured claim. See Exhibit "C" listing such lender and the property. The lender shall be allowed a secured claim based on the fair market value of the respective property determined by a hearing to be held by the Court before, at, or after confirmation as provided for in the Plan. Should the parties subsequently agree to the fair market value of the property and modification terms as to the Note, the lender, Trust and Debtor shall be bound by the terms of the modification agreement reached which shall be in writing and signed by the necessary parties. Should such agreement be reached and executed the lender then shall be treated as set forth in Class 2.

Should no agreement be reached, the Court will determine the rate of interest to be paid on the secured claim based on a thirty year amortization period and a maturity date of not less than ten years.  If the reorganized debtor agrees to retain the property after the determination by the Court of the value of the secured claim, the interest rate and other terms; then the reorganized Debtor shall determine whether he will retain the property and pay the obligation of the secured claim on the terms found by the Court, or whether he shall surrender the property to the lender. To the extent the allowed amount of the modified note (secured claim) is less than the amount set forth in the proof of claim filed by the lender or the amount scheduled by the debtor, such "unsecured" or under secured amount, if allowed, shall be treated as a Class 7 claim, unless the reorganized debtor decides to surrender the property and then all allowed claims of the lender shall, as to the Note secured by such property, be treated as a Class 7 claim and provided for in accordance with the Plan.

Allowed claims of a Lender whose properties are not retained by the Debtor and are surrendered to a Lender shall not participate in Class 7 dividends or distributions until such time they have liquidated the real estate collateralizing their Note and have reduced their allowed claim by the amount of the gross proceeds of recovered from the liquidated collateral.

The allowed claims of this Class shall be paid in accordance with the applicable treatment under Class 2, 3 or 7 whichever may be applicable.

The claims of Class 3 are impaired; however, if no lenders claims remain Class 3 claims at confirmation, then this class is not impaired and deemed to have accepted the Plan.

### Class 4:  Claims of Kelly and Brenda Hollon.

Class 4 claims consist of the obligations claimed to be owing to Kelly and Brenda Hollon. They have filed a proof of claim claiming they are owed $406,884.15. The Hollons have filed an adversary action, Case No. 10-03353, to determine their claims non-dischargeable ~~and if the Trust is liable and if Debtor is liable for the claims they have set forth in their Complaint~~. A prior suit in the Butler County Common Pleas Court was pending at the Petition Date and was stayed by the bankruptcy filing. Debtor is defending against such claims and disputes them in their entirety. To the extent the claims of Kelly and Brenda Hollon are allowed by the Court, they shall be treated as general unsecured claims as provided for in Class 7 below, and shall be bound by the terms and conditions set forth in the confirmed Plan. To the extent the claims of the Hollons are allowed and found to be non-dischargeable by a final non-appealable order of the Court, such claims shall be paid first on a pro-rata basis with all Class 7 allowed claims as provided for in the Plan. Should any distributions be made to the Hollons pursuant to the Plan those distributions shall be applied first to any non-dischargeable claims allowed by the Court. Once Class 7 claims have been paid as provided for in the Plan, should the Hollons still have any non-dischargeable allowed claims unpaid, those remaining unpaid allowed non-dischargeable claims shall be subordinated to the rights of other Class 1 through 6 claims allowed for by the Plan which are still remaining to be paid under the Plan and enforcement of such remaining claims shall be enjoined until such time all allowed payments provided for in Class1 through Class 6 are fully paid.

The Hollons assert, as evidenced by the adversary proceeding which they have filed against the Debtor, that the Debtor owes them a nondischargeable debt in the amount of $379,741.93 as of January 12, 2009. The Hollons assert that if the court determines that they are owed money by the Debtor and that any such amount is determined to be nondischargeable, they may immediately proceed to take collection action against the Debtor to collect any such amount determined to be nondischargeable, including to take judgment against the Debtor and to execute upon any such judgment, regardless of the Debtor's bankruptcy. The issue of whether the Debtor's Plan of Reorganization and any order confirming that Plan of Reorganization may bar the Hollons from taking collection activity on any debt determined to be nondischargeable, if any, until the Plan of Reorganization is fully consummated is a confirmation issue for determination by the Bankruptcy Court which must be made by the Court at or in conjunction with the confirmation hearing on the Debtors' Plan of Reorganization.

### Class 5:  Claims For Real Estate Taxes.

Debtor estimates that it has $330,844.30 of unpaid delinquent real estate taxes associated with retained properties for pre-petition and any unpaid post-petition real estate taxes through

May 25, 2010. Debtor has reached agreement with the Butler County Treasurer for delinquent taxes in the amount of $288,821.13 and Warren County Treasurer in the amount of $42,022.99. These delinquent taxes will be in accordance with delinquent tax agreements reached respectively with each Treasurer. The claims of the holders of real estate tax claims shall remain secured by statutory lien rights granted by law. The claims of Class 5 are impaired. Debtor has executed 16 delinquent tax repayment contracts with the Warren County, Ohio Treasurer to repay the delinquent real estate taxes in the amount of $42,022.99 through April 2016 monthly, paying approximately $4,800 per month. Debtor has executed 99 delinquent tax repayment contracts with the Butler County, Ohio Treasurer to repay the delinquent real estate taxes in the amount of $288,821.13 through April 2016 monthly, paying approximately $700 per month. Due to timing of the agreements and post-petition payments the monthly amount to be paid may vary slightly as payments are made or assessments are adjusted.

### Class 6: Claims of other Governmental Units.

Debtor does not believe any other priority tax claims exist. IRS initially filed a proof of claim in the amount of $232.74, but later amended the claim to show a zero balance. Debtor may object to any subsequent claims, if any are filed. To the extent any claims of this class are filed and allowed, they shall be repaid in quarterly installments after confirmation and shall be paid in full on or before May 24, 2015. Penalties claims allowed shall be classified as general unsecured claims. The claims of Class 6 are impaired however, if no claims remain Class 6 claims at confirmation, then this class is not impaired and deemed to have accepted the Plan.

### Class 7:  Other General Unsecured Claims.

The claims of this Class include all other claims not specifically provided for or as otherwise provided for in Classes 1-6, and without limitation, other general unsecured claims not having allowable and perfected security interests in property of the Debtor or the Trust, creditors claiming security interests in non real estate or vehicle collateral, penalty claims, timely filed claims not subject to treatment provided for in Class 1-6, and claims scheduled in Class F of the Schedules filed by the Debtor, if no proof of claim was filed.

Debtor shall pay an annual dividend of no less than $5,000.00 to allowed claims of this Class, on a pro rata basis, beginning October 10, 2012 and each following October 10th through 2021, or until such time Debtor has paid a dividend totaling $50,000.00. The amount of allowed unsecured claims not provided for payment as set forth above shall be discharged at confirmation. The payments as provided for in Class 7 shall not be discharged at confirmation and Debtor shall remain liable to pay the $50,000 as provided for until such $50,000.00 is fully paid. The Reorganized Debtor will accelerate payment of the $50,000.00 dividend to Class 7 allowed claims if projection amounts of $5,000.00 for Class 7 are exceeded per annum after full payment of the amounts due Class1-6 are paid in full for each year.

Filed proofs of claim of holders of claims in this class, excluding those under secured claims of Class 2 and holders of Class 3 and Class 4 claims, total approximately $332,652.90.The Hollons claims, which are disputed, total $406,884.15. See Exhibit F for the estimated amount of unsecured claims of secured lenders. The amount of allowed unsecured

claims not provided for payment as set forth above shall be discharged at confirmation, unless otherwise found to be non-dischargeable. The payments as provided for in Class 7 shall not be discharged at confirmation and Debtor shall remain liable to pay the $50,000 as provided for until such $50,000.00 is fully paid. Debtor shall accelerate payments as provided for in this Class, should Debtor accumulate more than $5,000.00 per annum in funds allocated to payment to Class 7 claims should such surplus funds exist after payment is made as provided for Class 1-6 allowed claims. The projections anticipate, should the projections be sustained, payment in year one of $6,800, in year two in the amount of $15,200.00 and year three of 12,000.00. If the projections are not met, the minimum amount to be paid to Class 7 is $5,000 per year until the $50,000.00 amount is fully paid. Any debt found to be non-dischargeable shall be accorded treatment in accordance with the Class 7, but shall be subject to payment on a prorate basis with other allowed claims of Class 7, to the extent such allowed non-dischargeable debts are not fully paid in accordance with Class 7 treatment, the holder of such allowed non-dischargeable debt shall be subordinated to the payments of allowed claims in Class1-6 until such Class 1-6 allowed claims are fully paid and the holder of such allowed non-dischargeable debts shall be enjoined from enforcement of such allowed non-dischargeable debt until the allowed claims of Classes 1-6 are fully paid and until such time the $50,000.00 due Class 7 allowed claims are fully paid.

### Class 8:  Interests of Jeffery A. Faulkner and Interests of Jeffery A. Faulkner in the Faulkner Family Trust.

The Trust shall retain ownership of the Properties retained at confirmation and any interests of the Trust or the Debtor in property of the estate shall vest in the Trust and/or the reorganized Debtor at confirmation.

To the extent a reaffirmation agreement has been filed or a modification order has been entered, lenders, the Trust and Debtor shall be bound by the reaffirmation or modification terms, with Jeffrey A. Faulkner to remain personally liable upon the allowed secured claim portion (modified amount of the Note) reaffirmed or as ordered. For properties where relief of stay has been granted or where possession of properties have been turned over to a lender, Jeffrey A. Faulkner shall not remain personally liable on the lender claims on notes or other claims of lenders that have mortgage notes and mortgages on any such property other than to be provided for in Class 7.

### III.

### Liquidation Analysis

The Liquidation Analysis is provided for a comparison of what creditors would receive in a Chapter 7 liquidation as opposed to what is provided for in the proposed Chapter 11 Plan.

Almost all assets of the Debtor are real estate properties, with a minimal amount of personal property.

Accordingly, in a hypothetical liquidation based upon the above assumptions, there would be insufficient proceeds to pay the secured claims of the various real estate lenders

12

holding mortgages on the Properties, resulting in no funds available for distribution to unsecured creditors. Real estate taxes are a statutory lien and thus a secured claim ahead of the claims of lenders holding mortgages on the Properties. Debtor's minimal personal property would be subject to exemption rights under Ohio law.

In liquidation, certain claims are entitled to priority prior to distribution to general unsecured creditors. These claims consist of administrative, perfected secured claims and priority claims pursuant to the priorities set forth in the Bankruptcy Code.

Administrative Expenses: Certain entities including Debtor's attorneys, accountants, appraisers, or other professionals authorized to be employed by the Debtor, if any, may file Applications with the Bankruptcy Court for the allowance of compensation and reimbursement of expenses. Requests for compensation are subject to approval by the Bankruptcy Court after a hearing on notice at which the Debtor and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses. Attorney fees are not known at present, but are estimated to be $128,000.00 at Confirmation. Other professional fees are estimated to be less than $5,000.00, if any. These amounts may be greater or lesser depending upon matters involved in the Chapter 11 proceeding, including issues relating to claims and the confirmation of the Plan. Additional administrative expenses would include U.S. Trustee fees unsatisfied at the time of the Plan Confirmation, which at this time are estimated to be $2,000.00 or less. U.S. Trustee fees continue to accrue until the case is closed. Other allowed administrative claims will be paid within 30 days of allowance. Any party seeking payment of an administrative claim must file such a request on or before the confirmation hearing date.

Secured Claims: Those creditors have properly perfected security interests in property of the estate or property of the debtor or the Trust, would have the right to liquidate their collateral, subject to the first priority statutory lien for real estate taxes. In this case none of the collateral secured to a lender exceeds the value of the debt, which would mean if liquidation were to occur, the liquidation of the assets by the secured lender or sale of the asset by the Debtor would not result in any value to the creditors holding general unsecured claims or priority claims.

Priority Claims: Certain claims, including certain government taxing authority claims are entitled to a priority position over general unsecured creditors. The Bankruptcy Code requires payment of these priority claims before distribution to general unsecured creditors or interest holders. Proofs of Claim filed to date indicate total priority claims asserted total $330,844.30 for delinquent real estate taxes. The Debtor has entered into delinquent tax payment agreements with both the Butler County and Warren Count Treasurer for the properties. These claims include estimated liabilities for tax claims which have not been finally resolved and it is anticipated a minimum liability once such claims are determined.

Administrative, properly perfected secured claims and priority claims (if any) would be entitled to payment prior to payment to general unsecured creditors.

## **Liquidation Analysis Summary:**

13

Given the above values, assumptions and claim amounts as set forth herein, Debtor sets forth that in liquidation, given the above values, amounts and assumptions, there would be insufficient proceeds to pay those secured creditors holding a lien on Debtor and/or Trust assets. Proceeds would not be available to pay administrative and priority claims, other than real estate taxes that serve as a first lien on the properties, and no proceeds would be available for distribution to general unsecured claims. Should the Debtor not be able to reorganize, the case is converted or dismissed and Debtor is unable to service the obligations on the various Properties, the following liquidation analysis is to demonstrate the expected results. Refer to Exhibit "D" as a projected result of liquidation sales of the Properties.

## IV.

### A. Projections

The Debtor has in accordance with his experience and expertise, formulated projections of income and expenses for the continued management of the Properties. These projections were formulated by the Debtor from the results obtained by the Debtor from post-filing operations and also based on reduction of principal and interest payments on 114 properties through loan modifications with lenders and from obtaining a 60 month repayment Plan period for payment of Delinquent Taxes. These projections are based on the modification agreements reach or expected to be reached before or at confirmation.

These projections, based upon the Debtor's most current information reflect the present opinion of the income to be generated by the management of the Properties, as well as the costs and expenses associated with its operation over the next three (3) years.

The projections, attached hereto as Exhibit "E", provide information on the continued operation of the anticipated reorganized Debtor based upon the Debtor's experience and current information and opinion regarding anticipated sales and expenses from the management of the Properties. It is cautioned that no representation can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding future income, future expenses, real estate tax adjustments, and other factors. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecast which would affect the business and operation of the reorganized Debtor. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the projections will undoubtedly vary from the projections and such variations may be material. The financial information set forth herewith should be reviewed in conjunction with other information regarding the Debtor's business and with such other information contained elsewhere in this Disclosure Statement and Debtor's monthly operating reports, summarized in Exhibit "A" are on file with the bankruptcy court should you care to review more than the summary.

### B. Risk Factors

14

Debtor's Plan is premised upon consolidation of the operation of the entities with payment to creditors under the confirmed Plan from continued operation of the business. As above noted, Debtor has set forth projections of anticipated income and expenses with respect to the continued operation of the business. Certain risk factors exist which could impact upon the Debtor's ability to maintain payments as provided for and required under the proposed Chapter 11 Plan. Such risk factors include the ability of Debtor to continue to rent the Properties for the same or more as has been experienced during the pendency of the case and which forms the basis of income projections. Risks associated with the continued sales income from the operation of the business include the potential for competition and general economic factors which could impact upon anticipated rentals into the future.

Additional risk factors exist with respect to Debtor's projected expenses with one of the significant risk factors associated with continued operation of the business involving real estate taxes, utility costs and maintenance expenses. These changes in costs can represent a risk factor with respect to projected income and expenses concerning the Chapter 11 Plan.

Debtor estimates that it needs to retain cash reserves of approximately $7,000.00 month to month. This cash reserve allows for Debtor to maintain operations in the event of a shortfall in income in any given month. As identified in the projections, Debtor has enumerated cash flow requirements and Debtor estimates that to maintain such uninterrupted operation of the business it requires an additional reserve of approximately $7,000.00 minimum for maintenance requirements and additional funds to stem any cash flow issues to cover rental income drop or interruption. The projections only include revenue from current properties owned by Debtor. Debtor intends to manage third party properties for additional income to assure funds are available should vacancies occur. Accordingly, as above identified, Debtor believes that the Plan submitted is feasible however, there are risk factors which exist that could possibly impact upon the operation of the business in the future.

## V.

## A. Bankruptcy Code Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of § 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Plan: (i) is accepted by all impaired classes of claims and equity interests, or if rejected or deemed rejected by an impaired Class, satisfies the "cram down" standard; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders (interest holders) impaired under the Plan.

Section 1129 of the Bankruptcy Code which sets forth the requirements that must be satisfied in order for the Plan to be confirmed, lists the following requirements for the approval of any Plan of reorganization:

1.      A Plan must comply with the applicable provisions of the Bankruptcy Code.

15

2.       The proponent of a Plan must comply with the applicable provisions of the Bankruptcy Code.

3.       A Plan must be proposed in good faith and not by any means forbidden by law.

4.       Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the case, or in connection with such Plan and incident to the case, must be approved by, or be subject to the approval of, the court as reasonable.

5.       (i)       (A)   The proponent of a Plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of such Plan, as a director, officer, or voting Trustee of the debtor, an affiliate of the debtor participating in a joint Plan and the debtor, or a successor to the debtor under such Plan; and

         (B) The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy; and

(ii)       The proponent of a Plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for each insider.

6.       Any governmental, regulatory commission with jurisdiction, after confirmation of a Plan, over the rates of the debtor must approve any rate change provided for in such Plan, or such rate change is expressly conditioned on such approval.

7.       Each holder of a claim or interest in an impaired class of claims or interests must have accepted the Plan or must receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date, or, if the class is a class of secured claims that elects non-recourse treatment of the claims under § 1111(b) of the Bankruptcy Code, each holder of a claim in such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. This is the so-called "best interests" test.

8.       With respect to each class of claims or interests, such class must accept the Plan or not be impaired under the Plan (subject to the "cram down" provisions discussed herein.)

9.       Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a Plan must provide that:

(i) with respect to an administrative claim and certain claims arising in an involuntary case, on the effective date of the Plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of the claim;

16

(ii) with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in §507(a)(3)-(6) of the Bankruptcy Code, each holder of a claim of such class will receive

> (A) if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

> (B) if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(iii) with respect to a priority tax claim of a kind specified in §507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the date of assessment of such claim of a value, as of the effective date of the Plan equal to the allowed amount of such claim, and such treatment must be in a manner not less favorable than the most favored non priority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under § 1122(b).

10.    If a class of claims is impaired under a Plan, at least one class of claims that is impaired under such Plan must have accepted the Plan, determined without including any acceptance of the Plan by any insider; except that in a case in which the debtor is an individual, the debtor may retain property included in the estate subject to the requirements of I 1 U.S.C. §1129(a) (14) described below.

11.    Confirmation of a Plan must not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan unless such liquidation or reorganization is proposed in the Plan. This is the so-called "feasibility" requirement.

12.    All fees payable under § 1930 of the Bankruptcy Code, as determined by the court at the hearing on confirmation of the Plan, must have been paid or the Plan must provide for the payment of all such fees on the effective date of the Plan.

13.    A Plan must provide for the continuation after its effective date of payment of all retiree benefits, as that term is defined in § 1114 of the Bankruptcy Code, at the level established pursuant to either subsection (e) (1 ) (B) or (g) of § 1114 of the Bankruptcy Code, at any time prior to confirmation of such Plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.    An individual debtor may not obtain confirmation unless post-petition domestic support obligations are paid in full.

15.    In those Chapter 11 cases in which the debtor is an individual, and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under

the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in 11 U. S.C. § 1325(b)(2)), to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

This Disclosure Statement discusses three of these requirements: (a) the feasibility of the Plan; (b) acceptance by impaired classes; and (c) the "best interests" standard. The Debtor believes that the Plan meets all the requirements of § 1129(a) of the Bankruptcy Code (other than as to voting, which has not taken place) and will seek a ruling of the Court to this effect at the hearing on confirmation of the Plan. You are urged to consult your own attorneys to evaluate each of the standards for confirmation of the Plan under the Bankruptcy Code.

## B. Vote required for Acceptance; Confirmation

The Bankruptcy Code defines acceptance of a Plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots (other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith). The Bankruptcy Code defines acceptance of a Plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots (other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith).

In addition to this voting requirement, § 1129 of the Bankruptcy Code requires that a Plan be accepted by each holder of a claim or interest in an impaired class or that the Plan otherwise be found by the Court to be in the best interests of each holder of a claim or interest in an impaired class. See "Best Interests Test" below.

If one Class of impaired Claims or Interests accepts the Plan, the Court may confirm the Plan under the "cram down" provisions of § 1129(b) of the Bankruptcy Code, which permits the confirmation of a Plan over the dissenting votes of creditors or equity interest holders that have voted, as a Class, to reject the Plan, provided that certain standards are met. See "cram down" below.

In the event any Voting Class votes against the Plan, and the Plan is not withdrawn, the terms of the Plan may be modified by the Debtor, as necessary to effect a "cram down" on such dissenting Class or Classes by reallocating value from all Classes Junior to the objecting Class or Classes to any impaired senior Classes until such impaired senior Classes are paid in accordance with the absolute priority rule of § 1129 (b) of the Bankruptcy Code. Any such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the hearing on the confirmation of the affected Plan. Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to § 1129 of the Bankruptcy Code will not limit or affect the Debtor's ability to modify the Plan to satisfy the provisions of §1129 of the Bankruptcy Code.

## C. Best Interest Test

Notwithstanding acceptance of the Plan by each impaired Class, in order to confirm the Plan the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest that has not accepted the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test of § 1129(a)(7) of the Bankruptcy Code requires that the Court find that the Plan provides to each Holder of a claim or interest in such impaired Class a recovery on account of the Holder's Claim or Interest that has a value of at least equal to the value of the Distribution that each such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtor were liquidated in a Chapter 7 case, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Debtor's case were converted to a Chapter 7 liquidation by a Chapter 7 Trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by the Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 reorganization case including sale costs. Debtor believes that a Chapter 7 liquidation would have a material and adverse effect upon the values which would be received by its creditors when measured against such values assuming consummation of the Plan. Refer to the Liquidation Analysis in Section III above and exhibits.

The Liquidation Value available to general creditor would be reduced by: (a) the Claims of secured creditors to the extent of the value of their collateral; and (b) the costs and expenses of the liquidation under Chapter 7, which would include: (i) the compensation of a Trustee and its counsel and other professionals retained; (ii) disposition expenses; (iii) all unpaid expenses incurred by the Debtor during its Reorganization Case (such as compensation for attorneys, auctioneers and accountants) which are allowed in the Chapter 7 case; (iv) litigation costs; and (v) Claims arising from the operation of the Debtor during the pendency of the Chapter 11 and Chapter 7 liquidation cases. The liquidation itself would cause the realization of additional Priority Claims and would accelerate other priority payments which would otherwise be payable in the ordinary course. These Priority Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay most other Claims or to make any Distribution in respect of Interests. A discussion concerning liquidation of the Debtor's assets is set forth above, See III. Liquidation Analysis.

Once the percentage liquidation recoveries for each Class are ascertained, the value of the Distribution available out of the Liquidation Value is compared with the value of the property offered to such Class under the Plan to determine if it is in the best interests of Holders of Allowed Claims or Allowed Interests, as the case may be, in such Class. After considering the effect that a Chapter 7 liquidation would have on the value of the Debtor, including the costs of Claims resulting from a Chapter 7 liquidation, the adverse effect of a forced sale on the prices of the Debtor's assets, the potentially adverse impact on the Debtor's business and the delay in the distribution of liquidation proceeds, the Debtor has determined estimated Liquidation Values for its Reorganization Case, which are set forth above. Based on the analysis set forth therein, and

subject to the assumptions and qualifications therein expressed, the Debtor believes that the Plan as proposed herein satisfies the requirements of the "best interests" test of § 1 129(a)(7) of the Bankruptcy Code.

### D. Fair and Equitable Test ; "Cram down"

Any Voting Class that fails to accept the Plan will be deemed to have rejected the Plan. Notwithstanding such rejections, the Bankruptcy Court may confirm the Plan and the Plan will be binding upon all Classes, including the Classes rejecting the Plan, if the Debtor demonstrates to the Bankruptcy Court that at least one impaired Class of Claims has accepted the Plan and that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class. A Plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for the secured and unsecured creditors as follows:

l.   Secured Creditors. Either (i) each secured creditor in a non-accepting impaired class retains the liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each secured creditor in a non-accepting impaired class realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

2.   Unsecured Creditors. Either (i) each unsecured creditor in a non-accepting impaired class receives or retains under the Plan property having a present value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Plan, unless new value is given by and through the operation of the Chapter 11 Plan; additionally, with respect to those cases in which the Debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in 11 U.S.C. § 1325(b)(2)) to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

THE DEBTOR BELIEVES THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO ANY CLASS AND IS FAIR AND EQUITABLE WITH RESPECT TO EACH IMPAIRED CLASS, THEREFORE, THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN EVEN IF LESS THAN THE REQUISITE NUMBER OF FAVORABLE VOTES ARE OBTAINED FROM ANY VOTING CLASS.

### E. Feasibility

The Bankruptcy Code requires that the Bankruptcy Court, in order to confirm the Plan must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that reorganized Debtor, subsequent to the Effective Date, will have a reasonable expectation of generating, through their own operations or access to sources of debt and/or equity capital, funds sufficient to satisfy their obligations under the Plan and otherwise.

Assuming consummation of the Plan substantially as described herein, the Debtor believes that the Plan meets the requirements of the Feasibility Test. The Debtor has prepared projections of the expected operating and financial results of reorganized Debtor, for three (3) years. Based on those projections, Debtor believes that the Plan complies with the financial feasibility standard for confirmation. The Debtor believes the results set forth in these projections are attainable and that it will have sufficient funds to met its obligations under the Plan and otherwise. Debtor for the most part has been servicing the modified debt on reaffirmation agreements or pursuant to Court ordered modifications. The Debtor is now servicing delinquent and current real estate taxes on retained properties on a monthly basis from cash flow from such properties. Debtor has been able to reduce principal and interest payments that existed on the loans pre-petition on a scale of 10 to 50% on properties where post-petition modifications agreements or reaffirmation agreements have been reached. Debtor has rehabilitated various properties post-petition and has reduced his vacancy rate from as much of 50% to 10% or less presently for properties retained. Debtor rents from $600 to $400 per month and the properties retained are situated in Warren and Butler County, Ohio, except for Debtor's residence in Preble County, Ohio. The projections presented are for anticipated rents to be collected from the retained properties. Jeffery Faulkner, through the Trust owned management company, Firco, will continue to manage these Properties. The Trust is the sole member of Firco and Mr. Faulkner is the sole Trustee of the Trust.  Mr. Faulkner will resume other business activity through the drive through carryout and carwash post-confirmation but only to the extent it will not impair his ability to perform the terms and condition of the confirmed Plan.

The Debtor cautions that no representations can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the Projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding continuing operations, many of which are the subject of continuing review and modification. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecasts which could affect the business and property. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the Projections will undoubtedly vary from the Projections, and such variations may be material.

### VI.

## **Legal Effect of Plan Confirmation**

1.    <u>As to cases in which Debtor is an Individual.</u> Unless after notice and hearing the Court orders otherwise for cause, confirmation of an individual Debtor's Chapter 11 Plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan under 11 U.S.C. §1141 (d)(5)(A). The Court may grant a discharge prior to Plan completion under sub-part (b) of that Section if there exists a lack of practical ability to modify the confirmed Plan and the distribution of all property under the Plan is no less than unsecured creditors would have received in a Chapter 7 liquidation. The Debtor and the Trust will not discharge the allowed secured claims as provided for in Class 2 until such obligations are fully paid as provided for in the reaffirmation-modification agreements or any Final Order governing the same. Debtor will seek a discharge order after confirmation of the Plan and before the entry of a Final Decree as to allowed unsecured claims of Class 7 to the extent such allowed claims exceed the $50,000.00 provided for payment on unsecured claims of Class 7. Any debt found to be non-dischargeable shall be accorded treatment in accordance with the Class 7, but shall be subject to payment on a prorate basis with other allowed claims of Class 7, to the extent such allowed non-dischargeable debts are not fully paid in accordance with Class 7 treatment, the holder of such allowed non-dischargeable debt shall be subordinated to the payments of allowed claims in Class1-6 until such Class 1-6 allowed claims are fully paid and the holder of such allowed non-dischargeable debts shall be enjoined from enforcement of such allowed non-dischargeable debt until the allowed claims of Classes 1-6 are fully paid and until such time  the $50,000.00 due Class 7 allowed claims are fully paid.

2.    <u>Scope of Discharge.</u> The discharge of the Debtor shall be effective as to each claim, regardless of whether a Proof of Claim was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan. On the effective date as to every discharge claim and interest any holder of such claim or interest shall be precluded from asserting against the reorganized Debtor or against their respective assets or properties any other or further claim or interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation date. Further, any holder of a claim or interest shall be precluded from asserting the same against the Debtor or the reorganized Debtor, except as specifically provided for in the Plan.

3.    <u>Injunction.</u> In accordance with §524 of the Bankruptcy Code, the discharge provided by the Plan and § 1141, including without limitation §141 (d) (5) (A) of the Bankruptcy Code, inter alia acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the claims discharged hereby or otherwise as provided for in the Plan.

4.    <u>Applicability.</u>  Except as otherwise may be set forth in the Plan, the discharge provisions of the Plan do not apply to rights, claims or causes of action whether asserted or yet to be asserted against a non-Debtor except that no rights, claims or causes of action can be asserted against the Debtor or reorganized Debtor.

5.    <u>Retention of Claims.</u> To the extent permitted by applicable law, and except as otherwise provided in the Plan including without limitation any contract, instrument, Final Order entered in

this case, release or other agreement entered into in connection with the Plan or by Order of the Bankruptcy Court in accordance with § 1123(b) of the Bankruptcy Code, the reorganized Debtor shall retain and may enforce any claims, rights and causes of action that the Debtor or its estate may hold including without limitation any claims, rights or causes of action under §544 through §550 inclusive of the Bankruptcy Code or any other applicable law. After the effective date, reorganized Debtor may pursue any such claims, rights and causes of action in accordance with what is in their best interest.

6.      Revesting and Vesting. Except as otherwise provided expressly in the Plan, on the effective date, all property comprising the estate of the Debtor and all interests of the Debtor in the Trust shall revest in reorganized Debtor and shall become property of the reorganized Debtor free and clear of all claims, liens, charges, encumbrances and interests of creditors and equity security holders (other than as expressly provided in the Plan or as provided for in reaffirmation agreements between Lenders and the Debtor). As of the confirmation date, Debtor shall operate its business and use, acquire and dispose of property including any post-petition cash collateral and settle or compromise claims or interests without supervision of the Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions expressly imposed by the Plan and Confirmation Order.

7.      Retention of Jurisdiction by the Bankruptcy Court. To the extent permitted by applicable law and notwithstanding Confirmation of the Plan or occurrence of the effective date, the Court shall retain jurisdiction over the reorganization case. Prior to the entry of a Final Order pursuant to Bankruptcy Rule 3022, the Bankruptcy Court shall retain jurisdiction:

a. Over all claims against or interests in the Debtor;

b. To determine the allowance of claims and interests upon objection to such claims    by the Debtor or reorganized Debtor;

c. To determine any tax liability pursuant to §505 of the Bankruptcy Code;

d. To adjudicate any dispute under any executory lease or contract assumed during the reorganization case pursuant to §365 of the Bankruptcy Code;

e. To resolve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtor;

f. To determine requests for payment of administrative claims;

g. To resolve controversies and disputes regarding the interpretation of the Plan, any Final Order entered prior to confirmation of the Plan including the determination of the priorities of distribution required by the Articles of the Plan;

h. To implement the provisions of the Plan and enter orders in aid of Confirmation in consummation of the Plan including without limitation, appropriate orders to enforce the

23

right, title and powers of reorganized Debtor from actions by holders of claims against or interests in the Debtor or actions in violation of the Section 524 injunction;

i. To determine classification voting treatment allowance estimation withdrawal disallowance or reconsideration of claims and interests and any objections relating thereto;

j. To fix, liquidate or estimate claims or interests;

k. To modify the Plan pursuant to § 1127 of the Bankruptcy Code;

1. To correct any defect, to cure any mistake or omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan;

m. To adjudicate any causes of action that arose or accrued prior to the Confirmation date or in connection with the implementation of the Plan including avoidance actions brought by the Debtor or reorganized Debtor as the representation of Debtor's estate or party in interest (as a representative of the Debtor's estate) including without limitation, the current adversary actions pending, and claims Debtor may assert against the City of Middletown, Ohio.;

n. To resolve disputes concerning any disputed claims reserve or the administration thereof and claims for disputed distribution;

o. To resolve any disputes concerning any release of the Debtor under the Plan or the injunction against acts of employment of process, or actions against the Debtor arising under the Plan;

p. To resolve any disputes concerning whether a personal entity had sufficient notice of the reorganization case, the applicable claims bar date, the hearing on the approval of the disclosure statement as containing adequate information, the hearing on the Confirmation of the Plan for the purpose of determining whether a claim of interest is discharged under the Plan or for any other purpose;

q. To order the removal pursuant to §1452 of Title 28 of the United States Code of any suit instituted against the Debtor, the estate, the reorganized Debtor or any person released pursuant to the Plan and to hear and determine any action so removed;

r. To enter a Final order closing the reorganization case; and

s. To hear and determine such other matters as may be provided for under Title 28 or any other Title of the United States Code and any reference to the Bankruptcy Code, the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or the Confirmation Order.

**ANY CREDITOR DESIRING INFORMATION REGARDING THE DEBTOR THAT SUCH CREDITOR BELIEVES IS NOT SUPPLIED BY THE DISCLOSURE STATEMENT IS REQUESTED TO CONTACT THE ATTORNEYS FOR THE DEBTOR.**

Dated: September 9, 2011.                    /s/ Jeffery A. Faulkner
                                            Jeffery A. Faulkner
                                            Debtor and Debtor in Possession



STATMAN, HARRIS & EYRICH, LLC

  /s/ Thomas R. Noland
Thomas R. Noland (0018239)
Michael Keefe (0086645
900 Fifth Third Center
1 S. Main Street
Dayton, OH 45402
937-222-1090
937-222-1046 fax
notices@statmanharris.com
Counsel for Debtor and Debtor in Possession